**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

ROBERT CONWELL,                                                    Case No. 1:14-cv-810

              Plaintiff,                                        Dlott, J.
                                                                   Bowman, M.J.

     v.

COMMISSIONER OF SOCIAL SECURITY,

              Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff Robert Conwell filed this Social Security appeal in order to challenge the Defendant's determination that he is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents a single claim of error. As explained below, I conclude that the ALJ's finding of non-disability should be REVERSED because it is not supported by substantial evidence in the administrative record.

**I. Summary of Administrative Record**

Plaintiff filed applications for Disability Income Benefits ("DIB") and for Supplemental Security Income ("SSI") on August 1, 2011, alleging disability beginning on April 24, 2009, due to solely to physical complaints, including breathing problems, heart problems, difficulty standing, and high blood pressure. (Tr. 85). On initial review, the agency added consideration of a "discovered learning disability" and referred Plaintiff for a consultative psychological examination. (Tr. 89). In relevant part, the results of that 2011 exam revealed: "Judgement is marginally sufficient. IQ's: VC 54, PR 63, WM 63, PS 71, FS 54. Mildly mentally retarded." (Tr. 90; see also Tr. 94, "clmt tested in the mildly mentally retarded range."). Nevertheless, Plaintiff's application was

denied both on initial review and on reconsideration without any consideration of Listing 12.05 for mental retardation.  (Tr. 91).  On reconsideration, the agency stated: "A learning disability was discovered on the initial claim, but clmt did not attend high school or have IQ tested.  There is insufficient medical evidence to indicate a learning disability…."  (Tr. 121).  After Plaintiff's application was denied initially and upon reconsideration, he requested a hearing *de novo* before an Administrative Law Judge ("ALJ").

At the hearing held in April 2013, Plaintiff's counsel primarily argued that Plaintiff met or equaled Listing 12.05C for mental retardation.  ALJ Vincent Misenti heard testimony from Plaintiff and from a vocational expert, but on June 10, 2013, denied Plaintiff's application in a written decision. (Tr. 11-21).  The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the Defendant's final determination.

Plaintiff was born in 1966 and was 47 years old at the time of the final decision. He dropped out of school at the age or 17 or 18 at the beginning of the ninth grade; there is no evidence that he ever sought or obtained a G.E.D.  He worked in a variety of manual labor jobs but has not engaged in any substantial gainful activity ("SGA") since his alleged disability date of April 24, 2009.  Based upon the record, the ALJ found that Plaintiff has the severe impairments of: "cardiovascular disease, diabetes mellitus, obesity, borderline intellectual functioning, and affective disorder."  (Tr. 13).  The ALJ additionally noted Plaintiff's hypertension, sleep apnea, hip tendinitis, and history of substance abuse (cocaine, cannabis, and alcohol), but did not find any of those impairments to be "severe."  (Tr. 14).

The ALJ determined that none of Plaintiff's impairments, either alone, or in combination with any other impairments, met or medically equaled a listed impairment

2

in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 14). Instead, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work, except:

> [T]he claimant could occasionally use foot controls for pushing or pulling, climb ramps or stairs, crawl, crouch, kneel, stoop, or balance; however, he should never climb ladders, ropes, or scaffolds or work in or around unprotected heights. He could occasionally work in or around the following: moving mechanical parts, the operation of a motor vehicle, humidity, wetness, or vibrations. In addition, the claimant is not able to perform a production rate pace but could perform goal-oriented work. Further, the claimant is limited to occasional social interaction with supervisors, coworkers, and the public. Finally, he is limited to tolerating few changes in a routine work setting.

(Tr. 16). While Plaintiff could not perform his past relevant work as a construction worker, lumber sorter, or garbage collector due to the exertional level required for those jobs, the ALJ determined based upon testimony of a vocational expert (VE) that Plaintiff still could perform "jobs that exist in significant numbers in the national economy," including assembly work and inspection work. (Tr. 21). Accordingly, the ALJ determined that Plaintiff was not under disability and not entitled to benefits. (Tr. 21).

On appeal to this Court, Plaintiff presents a single assertion of error: that the ALJ erred by failing to find that he met or equaled Listing 12.05C for mental retardation, and instead finding that he has "borderline intellectual functioning."

## II. Analysis

### A. Judicial Standard of Review

To be eligible for DIB or SSI benefits, a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is

available in the regional or national economies.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted).  In conducting this review, the court should consider the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.*  (citations omitted).

In considering an application for benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her

past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Com'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §416.920. However, a plaintiff bears the ultimate burden to prove by sufficient evidence that he or she is entitled to disability or supplemental security benefits. *See* 20 C.F.R. § 404.1512(a).

### B. Plaintiff's Assertion of Error Under Listing 12.05C

The Listing for mild mental retardation,[1] contained in 20 C.F.R. Part 404, Subpart P, Appendix 1, states:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports an onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> ...C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

*Id.* As reflected in the above language, Plaintiff was required to prove three things: (1) a valid IQ score in the 60-70 range; (2) deficits in adaptive functioning; and (3) that both low IQ and deficits in adaptive functioning manifested themselves prior to age 22.

The ALJ explained his reasons for determining that Plaintiff does not meet Listing 12.05 as follows:

> [W]hile the claimant's Full Scale IQ scores raises the issue of whether the claimant's cognitive functioning meets the requirements of Listing 12.05…, the significant deficits in adaptive functioning required by the Listing are not present. Specifically, the claimant lives alone, takes public transportation, and is able to test his blood sugars on his own (Hearing

---

[1]As of January 1, 2015, the phrase "mental retardation" has been replaced with the phrase "intellectual disability." The regulation otherwise remains unchanged. For consistency in this opinion, the undersigned uses the language in effect at the time of the Commissioner's last decision.

> Testimony). The claimant remains capable of performing several activities
> of daily living, including maintaining personal care, washing dishes, and
> grocery shopping (*id.*).   Further, the record documents a solid work
> history…. Despite the record containing a diagnosis of "mild mental
> retardation," the claimant was able to answer the undersigned's questions
> fluidly at the hearing.   Thus, while the claimant has some borderline
> intellectual deficits, his day-to-day activity, social functioning, and
> general comprehension is inconsistent with a diagnosis of mental retardation and
> indicates that the requirements of Listing 12.05 are not satisfied.

(Tr. 15-16).

Because the above analysis is so strongly contradicted by the administrative

record and is not supported by substantial evidence, remand is required.[2]

### 1. Plaintiff's IQ Scores

#### a. Adult Scores and Dr. Griffiths' Report

The ALJ acknowledged that Plaintiff's adult IQ scores "raise[d] the issue" of

Listing 12.05, based upon the psychological assessment of consulting examiner Brian

R. Giffiths, Psy.D,, whose opinions the ALJ gave "great weigh[t]." (Tr. 19).   Because he

lacked access to any records, Dr. Griffiths issued his report on the basis of a one-time

clinical interview and IQ testing performed the same date.   (Tr. 561). In his November

2011 report, Dr. Griffiths assessed Plaintiff's Verbal Comprehension score at 54 and

found his Full Scale IQ to be 56, scores so far below the requirements of Listing 12.05C

that they arguably would have qualified Plaintiff under Listing 12.05B, which does not

require any additional impairment when a claimant's IQ scores fall in the range of "59 or

less."  Dr. Griffiths' report included the following illustrations of Plaintiff's limited abilities:

> [W]hen asked to perform serial sevens he responded, "75, 64, 53."  He
> committed multiple errors counting backwards from twenty by three's.  He
> was able to recall four digits forward and three digits backwards.  He was
> able to mentally calculate four plus four and nine minus four.  He could not

---

[2]Plaintiff asserts, and Defendant does not dispute, that if he were found to have a valid qualifying IQ score
and the requisite deficits in adaptive functioning, he would meet or equal Listing 12.05C because he has
at least one additional "severe" impairment.

mentally calculate twenty divided by four or thirty-five minus eighteen.   He was unable to explain what the saying "what goes around comes around" means.  He stated that a "horse" and a "tiger" are similar because they are both "animals."  He appeared to be an intellectually limited person.

(Tr. 563).

At the time of the evaluation, Plaintiff resided in a homeless shelter, and participated in structured activities including daily AA meetings and working in the shelter's kitchen.  (Tr. 563).  He was brought to the examination appointment by his case manager at the shelter.  Dr. Griffiths observed that Plaintiff's speech patterns and other characteristics clearly showed that Plaintiff "is an intellectually limited person," a phrase used repeatedly throughout his report.  (Tr. 563, 565).  In describing Plaintiff's IQ scores, Dr. Griffith wrote that Plaintiff

> is currently functioning in the mildly mentally retarded range or at less than the 1st percentile for his age group.  The discrepancy between his verbal comprehension and perceptual reasoning scores is not unusually large.  He obtained a Working Memory Index Score of 63, indicating that his attention and concentration skills fall in the deficient range or less than the 1st percentile for his age group.

(Tr. 564, emphasis added).  Plaintiff's Processing Speed Score of 71 was one of the only scores within the borderline range.  A performance subscore assessing visual discrimination abilities also was found to be in the "borderline" range, but all other full scale scores and subscores fell within the range of intellectual disability or mild mental retardation.  Dr. Griffiths wrote:

> His visual integration skills, visual reasoning abilities, knowledge of word meanings, general fund of information, short-term auditory memory skills and verbal arithmetic reasoning abilities and visual motor coordination speed fall in the deficient range.  His abstract reasoning abilities fall well below acceptable limits.

(Tr. 565).

Despite the nearly universal consistency of Plaintiff's scores falling well below the upper limit of the mildly mentally retarded range, Dr. Griffith concluded that Plaintiff's

"performance on *this measure*[3] is somewhat lower than would be expected based on his clinical presentation. It is *possible* that emotional and/or motivational factors interfered with his performance on *this measure as he appears to be of borderline intelligence*." (Tr. 565, footnote and emphasis added). Dr. Griffiths' hypothesis that it was "possible" that Plaintiff's performance was influenced by motivational factors is undermined by other statements by Dr. Griffiths that although Plaintiff was "not a strong informant," he "did not appear to deliberately mislead the examiner." (*Id.*).

Dr. Griffiths never explains the basis for his opinion that Plaintiff "appears" to function at the substantially higher "borderline" range of functioning, a range that is approximately 15 points higher than Plaintiff's IQ scores reflect. Testing data provides no indication that any of Plaintiff's scores were invalid; to the contrary, Dr. Griffiths repeatedly confirms their internal consistency and validity, and repeatedly describes Plaintiff as "intellectually limited."

The lack of support of Dr. Griffiths' hypothesis that Plaintiff's performance on IQ testing *might* have been influenced by motivational or emotional factors, as well as his unexplained conclusion that Plaintiff "appears" to function at a much higher level than his IQ scores reflect, bears remarkable similarity to the fact pattern in *Dragon v. Com'r of Soc. Sec.*, 470 Fed. Appx. 454, 2012 WL 987758 (6th Cir. March 26, 2012). In *Dragon*, a consulting psychologist similarly opined that the plaintiff's low IQ scores were underestimates of the claimant's true intellectual functioning. The psychologist in that case stated that the scores were "lower than would be expected on the basis of clinical presentation," hypothesizing that "[e]motional and motivational factors may have

---

[3]It is not entirely clear what measurement Dr. Griffith refers to when he uses the phrase "this measure." The immediately preceding sentence refers not to Plaintiff's full scale IQ score, but instead to his abstract reasoning abilities, which were found to be "well below acceptable limits." (Tr. 565).

interfered with performance on this measure as [Dragon] appear[ed] to be of borderline intelligence." *Id.*, 470 Fed. Appx. at 461.  The Sixth Circuit reversed and remanded for an immediate award of benefits, finding error in the ALJ's reliance on the psychologist's opinion that plaintiff appeared to operate in the "borderline" range despite the consistency of plaintiff's scores in the mildly mentally retarded range, the fact that plaintiff's school age scores also placed her *below* the borderline range, and the psychologist's observation that the plaintiff "did not appear to exaggerate or minimize her difficulties." *Id.* at 461-462.  The Sixth Circuit distinguished *Dragon* from cases in which an ALJ disregards IQ scores "when those scores [are] undermined by a doctor's full evaluation" from the record presented, where the full evaluation "served to reinforce the I.Q. scores, rather than undermine them." *Id.* at 462.   As in *Dragon*, in the instant case Dr. Griffiths' complete evaluation only served to reinforce the validity of Plaintiff's IQ scores, rather than to undermine them.

### b.  Childhood IQ Scores

Although Dr. Griffiths' unsupported conclusion might be attributed in part to his inability to access any of Plaintiff's records, the ALJ was not so hampered.  Yet, despite a multitude of highly relevant records, the ALJ inexplicably failed to discuss or even reference them.  For example, Plaintiff not only testified that he was a special education student, but school records suggested that Plaintiff was placed in special education classes in *every subject* by multiple school systems throughout his limited educational career.  In addition, while a claimant is not required to produce childhood IQ scores to prove mental retardation developed prior to age 22, in this case school records contain IQ tests that are virtually identical to Plaintiff's adult IQ Verbal and Full Scale scores.  In 1982, when Plaintiff was 16 years old, his records reflect a verbal IQ of 54, a performance IQ of 65, and a full scale IQ of 55.  (Tr. 317-318).  The school psychologist

who performed the testing indicated "significant problems with poor academics, poor attention, poor impulse control, and an excess sense of persecution.  (Tr. 317). Additionally, she noted that Plaintiff had a history of suspensions and expulsions from his prior schools for fighting and talking back.  (*Id.*, *see also* Tr. 314).  Plaintiff's scores made him eligible for placement in an "educably mentally retarded class."  (Tr. 318). *See Rhodes v. Com'r of Soc. Sec.*, Case No. 2:13-cv-1147, 2015 WL 4881574 (S.D. Ohio, Aug. 17, 2015)(remanding for consideration of Listing 12.05 in light of unaddressed school records).

### 2.  Deficits in Adaptive Functioning

Perhaps in recognition of the overwhelming evidence of the validity of Plaintiff's qualifying IQ scores, Defendant seeks affirmance based upon the "adaptive functioning" elements of Listing 12.05C.  In *Foster v. Halter*, 279 F.3d 348 (6th Cir. 2001), the Sixth Circuit clarified that in addition to qualifying IQ scores, a claimant must satisfy the "adaptive functioning" standard in order to meet Listing 12.05C.  In that case, the plaintiff had dropped out of school after the ninth grade and had qualifying IQ scores measured when she was 42 years old, but still was held not to satisfy Listing 12.05 because there was no evidence of deficits in adaptive functioning before age 22, and because her long-standing work record as an accounting clerk at a bank and as a liquor store clerk demonstrated an "ability to perform relatively complicated tasks."  *Id.* at 355. Thus, in *Foster* and subsequent cases, the Sixth Circuit has held that in order to meet Listing 12.05, a plaintiff must show: "(1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations," in addition to the criteria under A, B, C, or D of Section 12.05.  *Hayes v. Com'r of Soc. Sec.*, 357 Fed. Appx. 672, 675 (6th Cir. 2009).  "Adaptive functioning" involves an individual's "effectiveness in areas such as social skills, communication, and daily living skills, and how well the

10

person meets the standards of personal independence and social responsibility expected of his or her age by his or her cultural group." *Heller v. Doe by Doe*, 509 U.S. 312, 329 (1993), citing *Diagnostic and Statistical Manual of Mental Disorders*, pp. 28–29 (3d rev. ed.1987).  Although Listing 12.05 does not define "adaptive functioning," another portion of the Listings defines "adaptive activities" as "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C)(1).  Finally, "[t]he American Psychiatric Association defines adaptive-skills limitations as '[c]oncurrent deficits or impairments ... in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'" *Hayes*, 357 Fed. Appx. at 677, citing DSM–IV–Tr at 45.

Courts have increasingly focused on the "adaptive functioning" element of Listing 12.05 over the past decade, while recognizing that the listing itself does not identify how severe limitations must be to qualify under its framework. *Pendleton v. Comm'r of Soc. Sec.,* No. 1:10–cv–650, 2011 WL 7070519, at *11 (S.D.Ohio Dec.23, 2011).  In addressing the issue, case law suggests that a claimant must have relatively significant deficits to satisfy the Listing, in part because many people with IQ scores lower than 70 remain capable of full-time work and therefore do not meet the Listing.  *See Thomas v. Com'r of Soc. Sec.*, 2010 WL 1254788 *8 (N.D. Ohio, March 24, 2010)(recognizing that "many individuals with mild mental retardation are still able to work"); *see also West v. Com'r of Soc. Sec.*, 240 Fed. Appx. 692, 698 (6th Cir.2007)(citing *Heller*, and holding that plaintiff who held a long term, full-time job, with many activities of daily living, did not show sufficient deficiencies in adaptive functioning).

Unlike the claimant in *Foster*, Plaintiff does present a long track record of deficits in adaptive functioning. In *Foster*, the record was silent as to deficits during the school years and it was unclear "why Foster did not continue her studies" after the ninth grade, By contrast, Plaintiff's records reflect that he was in special education classes throughout his school years, with significant, well-documented, and persistent deficits in multiple academic and social areas. Despite being placed in special education classes, he was required to repeat at least two grades (fourth and eighth) before he permanently withdrew at nearly 18 years old, at the beginning of the ninth grade. Plaintiff's records also reflect failing or near failing grades in all academic classes except physical education. Although academic records are not always definitive in showing deficits in adaptive functioning, in this instance Plaintiff's academic records and IQ testing reflect such poor performance in all areas, as well as low scores in all areas of communication skills, that they constitute substantial evidence in favor of a conclusion that Plaintiff had early significant deficits in communication and functional academic skills. Moreover, deficits in social skills are documented in the report of his repeated disciplinary problems.

The ALJ's analysis of Plaintiff's adaptive functioning was minimal. To conclude that "the significant deficits in adaptive functioning…are not present," the ALJ primarily relied upon the Plaintiff's ability to live alone, take public transportation, test his blood sugars on his own, maintain personal hygiene, wash dishes, and grocery shop with his food stamps. The ALJ also cited Plaintiff's "solid work history," and referenced his day-to-day activity, social functioning and general comprehension as "inconsistent" with mild mental retardation, without elaboration. Last, the ALJ relied upon Plaintiff's alleged ability "to answer …questions fluidly at the hearing." (Tr. 16). Unfortunately, the cited

reasons appear to have no support in the record at all, or alternatively, are supported by less than substantial evidence.

First, the fact that Plaintiff "lives alone, takes public transportation, and is able to test his blood sugars" (akin to taking medication) is not inconsistent with mild mental retardation.  *See Brown v. Sec. of HHS,* 948 F.2d 268, 270 (6th Cir.1991)(finding that use of public transit, making change at grocery store, obtaining a driver's license, visiting friends, doing laundry and cleaning room is not necessarily "inconsistent with a valid test I.Q. of 68").  Here, the record shows that Plaintiff is successful in taking public transportation only for routes he knows well, and that his case manager provides him with bus tokens.  He requires assistance to use public transportation to go anywhere new.  (Tr. 69).  He has never had a driver's license.  *See also Wilkerson v. Com'r of Soc. Sec.*, 2010 WL 817307 (S.D. Ohio, March 5, 2010).

The ALJ's reliance on Plaintiff's ability to live alone was similarly misplaced.  The record reflects that Plaintiff has lived in halfway houses and homeless shelters for years[4] (Tr 102), and was living in a homeless shelter at the time of his psychological examination by Dr. Griffiths.  Even Dr. Griffiths noted that Plaintiff's judgment was only "marginally sufficient for him to make decisions affecting his future and to conduct his own living arrangements efficiently."  (Tr. 564).  Although Plaintiff was living alone in an apartment at the time of the hearing, that arrangement was made possible only through the assistance of Plaintiff's case manager at Talbert House, which arranged for the free housing for Plaintiff and paid all bills.  Plaintiff testified that he has never had any type of checking or savings account, and has never paid a bill.  (Tr. 67-68).   In addition to regular checkups by his Talbert House case manager, who takes him to doctor's

---

[4]Plaintiff has also been incarcerated for domestic violence and drug offenses.  Living in prison also cannot be viewed as evidence of independent living at a level that is inconsistent with mild mental retardation.

appointments and sometimes accompanies Plaintiff on errands (Tr. 68-69), Plaintiff's neighbors check on him and assist him with groceries, and his sister checks on him at least twice per week. (Tr. 66). Plaintiff's sister performs all routine cleaning and household chores, other than washing the minimal dishes, cup and utensils that Plaintiff uses, which he washes himself twice per day. Plaintiff does not cook with pots or pans, but can prepare microwavable meals for himself. (Tr. 66). In other words, going beyond the superficial observation that Plaintiff "lives alone" quickly reveals that Plaintiff historically has been unable to "conduct his own living arrangements" as Dr. Griffiths suggested, and has demonstrated only marginal success in "living alone" in a housing arrangement that is akin to a highly supportive living arrangement, complete with a case manager.

In addition, the undersigned is hard-pressed, reviewing Plaintiff's employment records, to understand on what evidence the ALJ relied to describe his work history as "solid." A lengthy employment history can be evidence of a lack of deficits in adaptive functioning. However, Sixth Circuit cases that rely on successful work history most frequently evidence a far more significant history, and involving a higher skill set than the sporadic manual laborer positions held by this Plaintiff. *See e.g., Justice v. Com'r of Soc. Sec.*, 515 Fed. Appx. 583, 587 (6th Cir. 2013)(noting evidence of "lengthy work history, including a variety of semiskilled and unskilled positions."). Noting Plaintiff's description of a "very limited employment history," Dr. Griffiths opined that it was "very likely that intellectual limitations and substance abuse problems interfered with his occupational functioning." (Tr. 567, emphasis added). Dr. Griffiths opined that any day-to-day work activity "would very likely exacerbate depressive symptomatology leading to withdrawal and slowed work performance," and "might also magnify intellectual

14

<u>limitations</u> leading to mental fatigue, mental confusion and frustration."   (Tr. 567, emphasis added).

Here, the ALJ acknowledged that Plaintiff has had no SGA since April 2009.  In reality, employment records suggest that from 1994 through 2013, Plaintiff's earnings exceeded the presumptive SGA amount only for the periods of 1994-1997 and 2000-2001.  (Tr. 226).  The regulatory scheme prescribes when and how earnings will be averaged over a period of work, see 20 C.F.R. §404.1574a.  Typically, the regulation prescribes averaging "separately for each period in which a different substantial gainful activity earnings level applies" when there is a substantial change in monthly income. *Id.*  Plaintiff's records reflect many relatively short periods of unskilled jobs held with a variety of employers,[5] punctuated by periods of unemployment.   A presumption may apply against finding that a claimant engaged in SGA if the average monthly earnings from his work fall below an amount that is adjusted on a yearly basis to account for national average wage growth.  *Id.* Additionally, employment periods of three months or less are often considered not to be substantial gainful activity.   20 C.F.R. §404.1574(a)(1).

The undersigned also finds little support in the record for the ALJ's characterization of Plaintiff's responses to his questions at the hearing as "fluid[]."  A full review of the transcript suggests the exact opposite, with frequent misunderstandings of the questions, mix-up on words, syntax, and dates of events, and recorded lapses of "no verbal response."  (Tr. 27-84). For example, Plaintiff initially stated that he could read at an eighth grade level, but later responded that he first learned to read in the eighth grade, and left school in the ninth grade.  (Tr. 33, 38-39).  The ALJ also found

---

[5]Plaintiff appears to have had only one longer term period of employment in his life, during the 1990's when he worked on a garbage truck (not as a driver) for the Bibb County Commission.

Plaintiff's assertion of "limited" reading skills to be "inconsistent" with his ability to read contact information off of the business card of his case worker at the homeless shelter to administration employees over the telephone. (Tr. 18, citing Tr. 105). The undersigned cannot agree that the ability to read the name and telephone number of Plaintiff's case worker from a business card is inconsistent with limited reading skills. Moreover, Plaintiff's 2011 IQ tests, Dr. Griffiths' report,[6] and historical school records all strongly support Plaintiff's testimony that he has significant deficits in reading.

As evidence of day-to-day activity that he found to be inconsistent with Listing 12.05C, the ALJ referred to Plaintiff's ability to work in a homeless shelter kitchen, attend to his own grooming and personal hygiene needs, and perform basic grocery shopping and tasks involving money. (Tr. 18). The undersigned has already discussed Plaintiff's limitations with money, including a lack of history of paying bills or holding any checking or similar accounts. Dr. Griffiths' report highlights deficits in math skills that further undermine the ALJ's presumptive conclusions concerning Plaintiff's proficiency with money. Finally, work activity in a homeless shelter, like the similar work Plaintiff performed in a prison kitchen, is presumed to be highly structured and supervised.

Defendant cites multiple cases from outside of the Sixth Circuit to support the ALJ's reasons for finding that Plaintiff does not suffer from deficits in adaptive functioning. While not controlling, many of the cases on which Defendant relies appear favorable to the Plaintiff's position. *See, e.g., Maresh v. Barnhart*, 438 F.3d 897, 900-01 (8th Cir. 2006)(finding deficits where claimant struggled in special education classes

_____

[6]Although the ALJ heavily relied upon Dr. Griffiths' report to formulate Plaintiff's mental RFC, the record does not appear to contain a mental RFC form that specifically translates the narrative report to the framework used under social security guidelines. For example, Dr. Griffiths noted that "[l]imitations with sustained attention and concentration and task persistence and pace are expected," without opining whether such limitations would be moderate or severe, other than noting related index scores that fell in both "deficient and borderline" ranges. (Tr. 566).

through the ninth grade and then dropped out, with a record of frequent fights with other children).

More importantly, the Sixth Circuit cases upon which Defendant relies are factually distinguishable from the record presented. For example, in *West v. Com'r of Soc. Sec.*, 240 Fed. Appx. 692 (6th Cir. 2007), the Sixth Circuit affirmed the ALJ's rejection of the claimant's contention that he met 12.05C and instead functioned in the borderline intellectual range, where there was *no* diagnosis of mental retardation in his records, plus "absolutely no evidence that [claimant] experienced deficiencies at all in 'adaptive functioning,' let alone that any such deficiencies arose during the developmental period." *Id.* at 698. The Sixth Circuit specifically noted the claimant's "numerous…daily activities" and that he had "held a long-term, full-time position" as a city employee over *many years* prior to reducing his schedule to part-time work. Additionally, the appellate court pointed to medical evidence that found *no* difficulties in following simple instructions, maintaining concentration and attention, interacting effectively with co-workers and supervisors, and no significant difficulty dealing with work stress. *Id.* at 699. Plaintiff's work history, records of an actual diagnosis of mental retardation (both conflicting statements in Dr. Griffiths' report and his childhood diagnosis), level of daily activity, and evidence of significant deficiencies in adaptive functioning both in the developmental period and in his adult life, all distinguish this record from that presented in *West. See also Cooper v. Com'r of Soc. Sec.*, 217 Fed. Appx. 450, 452 (6th Cir. 2007)(noting only one qualifying IQ score with most above 71, absence of any mental retardation diagnosis, work history that included semiskilled work for a number of years, playing guitar, and riding a motorcycle); *Courter v. Com'r of Soc. Sec.*, 479 Fed Appx. 713 (6th Cir. 2012)(affirming based on extensive work history

and activities of daily living, school records that showed higher IQ score, and lack of formal diagnosis of mental retardation).

Defendant also points to Plaintiff's own report that he received "A's and B's" in his special education classes and had no disciplinary problems. (Tr. 561). First, even Dr. Griffiths documented that Plaintiff was "not a strong informant" in relating his history, a fact that is abundantly clear from the transcript of the hearing. Second, the school records before the ALJ conclusively showed that, contrary to Plaintiff's rosy report, Plaintiff obtained failing grades in his special education classes, repeated several grades (including fourth and eighth grades), and had a history of being suspended and expelled for fighting.

The undersigned acknowledges that social security cases are inherently fact-specific. The undersigned's conclusion that stronger evidence exists to support a different outcome than that reached by the Commissioner is not sufficient to reverse, so long as the record contains substantial evidence to affirm, recognizing the "zone of choice" in which such decisions are made. Many similar cases exist in which the undersigned has recommended that the Court affirm the Commissioner's decision, including cases assigned to the same presiding district judge assigned to this case. *See e.g., Holley v. Com'r*, No. 1:14-cv-59, 2015 WL 350572 (S.D. Ohio, Jan. 23, 2015); *White v. Com'r*, Case No. 1:14-cv-218, 2015 WL 470812 (S.D. Ohio, Jan. 7, 2015); *Green v. Com'r*, Case No. 1:11-cv-522, 2012 WL 2620017(S.D. Ohio, July 5, 2012); *Sandlin v. Astrue*, Case No. 1:11-cv-458, 2012 WL 2030175 (S.D. Ohio, June 6, 2012).

Despite their similarity, the undersigned recommends reversal on the record presented based upon the critical factual and/or legal distinctions discussed herein. Viewing this record as a whole, the undersigned cannot find substantial evidence to support the ALJ's determination that Plaintiff does not meet or equal Listing 12.05C.

*Accord Napier v. Com'r of Soc. Sec.*, Case No. 1:13-cv-644, 2014 WL 5308581 (S.D. Ohio, Oct. 16, 2014)("[R]emand is required here because, instead of discussing the contrasting sets of IQ scores and/or which scores more validly represented Plaintiff's IQ, the ALJ merely parroted the finding of an examining psychologist that Plaintiff's '[a]daptive functioning suggested borderline range of ability,'" despite that expert's failure to explain the basis for his finding or conclusion that the claimant functioned in the borderline range); *see also McClellan v. Astrue*, 604 F. Supp.2d 678 (E.D. Tenn. 2011)(remanding for further consideration on similar facts); *Dragon v. Com'r of Soc. Sec.*, 470 Fed. Appx. 454, 2012 WL 987758 (6th Cir. March 26, 2012)(reversing for award of benefits under Listing 12.05 where ALJ improperly ignored and invalidated qualifying IQ scores despite "significant" evidence of deficits in adaptive functioning);

### III. Conclusion and Recommendation

In cases like this one in which the ALJ failed to apply the correct legal standards and his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under Sentence Four of 42 U .S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan,* 501 U.S. 89, 99, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991).  In light of the close factual similarity to *Dragon*, and viewing the record as a whole, the undersigned concludes that a judicial award of benefits is warranted. Evidence of disability is overwhelming, and only the slightest contrary evidence exists.

Accordingly, **IT IS RECOMMENDED THAT** the decision of the Commissioner to deny Plaintiff SSI benefits be **REVERSED,** and that this matter be remanded solely for the calculation of an award of benefits.  As no further matters remain pending, this case should be **CLOSED**.

*/s Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

ROBERT CONWELL,                              Case No. 1:14-cv-810

            Plaintiff,                       Dlott, J.
                                             Bowman, M.J.
      v.

COMMISSIONER OF SOCIAL SECURITY,

            Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

21